# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **TRUBRIDGE, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff/Counterclaim** | ) | |
| **Defendant,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 18-0141-CG-C** |
| | ) | |
| **TYRONE HOSPITAL,** | ) | |
| | ) | |
| **Defendant/Counterclaim** | ) | |
| **Plaintiff.** | ) | |

## ORDER

This matter is before the Court on the Motions for Summary Judgment, supporting briefs, and evidentiary support filed by both Plaintiff, TruBridge, L.L.C ("TruBridge") (Docs. 110 and 112) and Defendant, Tyrone Hospital ("Tyrone") (Docs. 101, 108[1], and 109). Both parties have filed responses and additional evidentiary support (Docs. 115, 116, 120 and 121), and replies (Docs. 122 and 123). For the reasons explained below, the Court finds that Plaintiff's motion for summary judgment should be DENIED in part and GRANTED in part. Specifically, TruBridge's motion is denied with respect to its breach of contract claim, granted as to any claims for incidental or consequential damages, and granted as to the outstanding invoices as set forth herein below. Defendant's motion for summary judgment is DENIED.

---

[1] Tyrone's initial motion (Doc. 103) was filed under seal and was later refiled with limited redactions (Doc. 108). This Order will reference document 108.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 10, 2016, TruBridge and Tyrone entered into a "Master Services Agreement" (the "Agreement") whereby the parties agreed that TruBridge would perform billing and collections services for Tyrone. (Doc. 108; PageID.652; Doc. 110-1 at 3; PageID.1115-1131; Doc. 112 at 3; PageID.1309). The Agreement was limited to TruBridge performing "insurance follow-up" services to Tyrone for claims over sixty days old. (Doc. 108 at 2; PageID.652; Doc. 112 at 3; PageID.1309). In return, Tyrone agreed to pay TruBridge a monthly service fee based on the money collected on the claims. (Doc. 112 at 4; PageID.1310).

The Agreement was modified on May 5, 2016, to provide that TruBridge would also provide "Private Pay Management Services" to Tyrone ("Private Pay Addendum"). (Doc. 108 at 2; PageID.652; Doc. 112 at 4; PageID.1310). The Private Pay addendum provided that TruBridge would provide billing and collection service on patient accounts. (Doc. 112 at 4; PageID.1310). In return, Tyrone agreed to pay TruBridge a monthly service fee based on the cash collected from patient accounts. (*Id*.)

On August 9, 2016, the parties modified the Agreement again by a "Service Addendum" whereby the parties agreed that TruBridge would provide additional services, including Accounts Receivable Management Services ("ARMS") to Tyrone for five years beginning December 1, 2016 ("August Addendum"). (Doc. 108 at 5; PageID.655; Doc. 112 at 4; PageID.1310). Per the August Addendum, TruBridge was to handle "the billing of all patients, to include… the billing of all primary and

secondary claims to all third party payers." (Doc. 108 at 3; Page ID. 653; Doc. 112 at 4; PageID.1310). In return, Tyrone agreed to pay TruBridge 3.75% of its total cash collections. (Doc. 112 at 4; PageID.1310). Finally, on January 5, 2017, the parties amended the Agreement once more by removing Clinic A/R from the scope of services TruBridge was to perform. ("Final Addendum"). (Doc. 108 at 3; PageID.873).

In its final form, the Amended Agreement[2] required TruBridge to bill and collect Tyrone's claims and patient accounts and Tyrone was required to pay TruBridge for services rendered for five years. (Doc. 108 at 8; PageID.875; Doc. 112 at 5; PageID.1311). The Amended Agreement did not include any performance goals, metrics, or requirements and did not include any termination provision relating to the same. (Doc. 112 at 5; PageID.1311). The Master Services Agreement, which was incorporated into all subsequent addenda, included the following limited liability provision:

> **Liability:** TRUBRIDGE'S LIABILITY FOR FURNISHING SERVICES UNDER THIS AGREEMENT SHALL BE LIMITED TO PROVIDING THE SERVICES DESCRIBED. TRUBRIDGE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES INCURRED BY CUSTOMER AS A RESULT OF THE LOSS OF USE OF THE SERVICES, OR ANY PART OR COMPONENT THEREOF, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OR OCCASSIONED BY THE FAILURE OF TRUBRIDGE TO PERFORM ANY OBLIGATION UNDER THIS AGREEMENT.

(Doc. 110-1 at 6; PageID.1119).

---

[2] This Order will refer to the Agreement and all subsequent addendums hereinafter as the "Amended Agreement".

From December 1, 2016 to March 2018, TruBridge billed and collected $29,279,556.72 in payments from third party payers and patients on behalf of Tyrone. (Doc. 112 at 6; PageID.1312). However, despite its handling of accounts receivable, from 2016 to February 2018, the parties experienced difficulties on both sides. (Doc. 108 at 5; PageID.875; Doc. 112 at 11; PageID.1317). More specifically, Tyrone was dissatisfied with TruBridge's handling of its collection services based on the number of claims not being collected and TruBridge was concerned that Tyrone was not providing medical records and data needed to process accounts receivable. (*Id.*)[3] In response to Tyrone's concerns regarding the billing and collection, TruBridge proposed Action Plans with performance goals set by TruBridge. (Doc. 108 at 7; PageID.877). The parties continuously discussed the need for changes and improvements and were in the process of negotiating additional contractual terms in 2018. (Doc. 108 at 5-8; PageID.875-78; Doc. 112 at 10-12: PageID.1316-18). However, on February 22, 2018, prior to finalizing additional contractual terms, Tyrone sent TruBridge a termination letter which stated, in part, as follows:

> Please be advised that Tyrone Hospital d/b/a Tyrone Regional Health Network is terminating its Master Services Agreement ("MSA") with TruBridge, LLC dated February 10, 2016 and all addenda thereto due to breaches of the agreements by TruBridge, LLC. This is due to the significant breaches and non-compliance on the part of TruBridge, LLC in its performance of the Agreement and various addenda.

(Doc. 110-15 at 2-3: PageID.1335-36). The termination letter additionally stated that there were "1,061 Medicaid claims which have not been billed by TruBridge …

---

[3] The disputed facts relating to these positions are more fully set forth herein below.

totaling $2,278,249.20 in charges as of February 19, 2018." (*Id.*) In response, TruBridge filed the instant action seeking damages for breach of contract.[4] (Doc. 1-1 at 9-15). On March 26, 2018, Tyrone responded to the Complaint and countersued for declaratory and injunctive relief[5] as well as damages for breach of contract and equitable relief. (Doc. 2). On January 28, 2020, Tyrone filed its motion for summary judgment asserting that TruBridge breached the Amended Agreement by failing to perform the agreed services. (Docs. 101 and 108). On January 31, 2020, TruBridge filed its motion for summary judgment asserting that it had performed under the contract and TruBridge breached the contract via the termination letter. (Doc. 112). The parties have each responded and replied to each other's motions and both are ripe for adjudication. (Docs. 116, 118, 122, and 123).

## DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the

---

[4] This action was initially filed in the Circuit Court of Mobile County and was removed to this Court by Defendant based on diversity jurisdiction. (Doc.1)
[5] The parties ultimately reached a resolution of the injunction issues. (Doc. 10). As a result, with permission, Tyrone filed an Amended Answer and Counterclaim removing those causes of action. (Doc. 32).

non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof

at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Breach of Contract[6]

Tyrone asserts that summary judgment is due to be granted in its favor because TruBridge failed to perform under the Amended Agreement, which is a

---

[6] This Court will address the breach of contract claims asserted by the parties together.

breach under Alabama Law.  (Doc. 108 at 16; PageID.666).  In response, TruBridge

contests the facts as set forth by Tyrone and asserts that even if those facts were

true, Tyrone would still not be entitled to summary judgment because TruBridge

need not prove "perfect performance" but must "only show that it substantially

performed under the Amended Agreement."  (Doc. 116 at 4; PageID.1477.)

TruBridge additionally asserts that the reasons provided by Tyrone for its

termination are pretextual and that some of the documents relied on by Tyrone are

hearsay.[7]  In reply, Tyrone responds to the hearsay objections raised by TruBridge,

refutes that its reasons for termination were pretextual, and reasserts that

summary judgment should be granted.  (Doc. 123, generally).

TruBridge simultaneously asserts that summary judgment should be granted

in its favor as to its breach of contract claim and as to the counterclaims asserted by

Tyrone.  More specifically, it argues that it performed its contractual obligations

under the Amended Agreement until February 22, 2018, when it received the

termination letter from Tyrone and that Tyrone is precluded from recovering

damages under the limitation of liability in the Amended Agreement. (Doc. 112,

generally). TruBridge further seeks summary judgment as to two invoices sent to

Tyrone for its services, which Tyrone has not paid. (*Id*.)  In response, Tyrone argues

that the Agreement was modified by the actions of the parties beginning in Spring

2017 and that the issue of substantial performance is a question of fact to be

---

[7] Specifically, TruBridge asserts that "Johnson-Albert Call" and "Johnson-Albert Email" are hearsay.  (Doc. 116 at 17-18; PageID.1490-91).  These correspondences are described further hereinbelow.

decided by a jury. (Doc. 120 at 2, 4-6; PageID.1712, 1714-16). In reply, TruBridge denies the Amended Agreement was modified, maintains that is substantially performed, refutes that Tyrone is entitled to damages under the limitations provision, and asserts that there is no dispute that it is owed the amount it seeks from the two outstanding invoices. (Doc. 112, generally).

Under Alabama law, "[i]n order to establish a breach-of-contract claim, a plaintiff must show '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So.3d 690, 696 (Ala. 2013) quoting *S. Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995) (internal quotations omitted). The parties do not dispute that a contract existed or that the termination letter of February 22, 2018 terminated the agreement. As a result, the issues to be resolved are whether the parties modified the agreement and whether TruBridge failed to perform its contractual obligations. If there is no question of fact that TruBridge performed, then TruBridge is entitled to summary judgment. If there is no question of fact that TruBridge failed to perform, then Tyrone is entitled to summary judgment. Lastly, if there is a question of fact as to whether TruBridge performed, then neither Tyrone nor TruBridge is entitled to summary judgment.[8]

[8] Both parties have acknowledged that if the Court determines that there is a question of disputed fact as to whether TruBridge performed, then neither motion for summary judgment can be granted. (*See* Doc. 120 at 1; PageID.1711) ("To the extent this Honorable Court does not grant Tyrone Hospital's Motion for Summary Judgment, genuine issues of material fact preclude summary judgment in favor of

1.      Modification

Because whether the contract was modified could impact any determination on performance and/or breach by TruBridge, this Court will first address the issue of modification.  In its response to TruBridge's motion for summary judgment, Tyrone has asserted that the Amended Agreement was modified by the actions of the parties when TruBridge proposed performance metrics via "Action Plans".[9] (Doc. 120 at 2-4; PageID.1712-14).  In support of its position, Tyrone has cited to several cases which hold that in Alabama, (1) parties to a contract may modify an executory contract, (2) that if the terms of the subsequent agreement contradict the earlier agreement, then the later agreement prevail, (3) that no consideration is necessary for modification, (4) that a written contract may be modified by a subsequent oral agreement even if the contract requires all modifications be in writing, and (5) that an intention to waive a right can be found in a parties conduct.[10] (Doc. 120 at 2-3; PageID.1712-13). In its reply, TruBridge denies that its

---

TruBridge); *see also* Doc. 122 at 13; PageID.1963)("Nevertheless, if the Court accepts Tyrone Hospital's argument on this issue and denies the TruBridge Motion for Summary Judgment, then the Tyrone Hospital Motion for Summary Judgment, in which Tyrone claims there are no genuine issues of material fact on this issue, must be denied as well.")

[9] The Court notes that, although it could have been, this argument was not raised in Tyrone's initial motion for summary judgment.  However, because TruBridge had an opportunity to respond to Tyrone's argument the Court will address modification.

[10] Citing to *Peoples Bank & Trust Co. v. Coleman*, 736 F.2d 643, 644 (11th Cir. 1984); *Nature's Way Marine LLC v. Everclear of Ohio Ltd.*, 37 F.Supp. 3d 1232, 1241 (S.D. Ala. 2014); *Commercial Contractors, Inc. v. United States Fidelity & Guaranty, Co.*, 524 F.2d 944, 952 (5th Cir. 1975); and *Retail Developers of Alabama, LLC, v. East Gadsden Golf Club, Inc.*, 985 So.2d 924 (Ala. 2007).

Action Plans were modifications to the Amended Agreement. (Doc. 122 at 2-3; PageID.1952-53). For support, TruBridge relies on the testimony of Tyrone's CFO, Todd Dieffenbach ("Dieffenbach") who testified that the action plans were goals, not modifications and the fact that when Tyrone sent the termination letter the parties were actively renegotiating the Amended Agreement to include performance metrics, which would not have been necessary had the action plans served to modify the Agreements. (Doc. 122 at 2; PageID.1952).

There is no dispute that in response to some of Tyrone's concerns relating to TruBridge's performance, TruBridge proposed Action Plans that included performance goals. (Doc. 122 at 2; PageID.1952). Nevertheless, Tyrone has not raised a genuine issue of material fact as to whether the Action Plans modified the Amended Agreement. Rather, despite the caselaw cited, Tyrone fails to set forth any facts to support that the parties wanted or meant to modify the Amended Agreement in this case through the course of their actions. To the contrary, the facts show that the Action Plans proposed by TruBridge were meant to be goals and were believed to be goals by both parties. As such, Tyrone has not shown that the Action Plans were a modification of the Amended Agreement. Accordingly, whether TruBridge substantially performed under the Amended Agreement need not include a determination of whether it breached by not meeting the performance goals set forth in the Action Plans.

2.     Performance

The issue of performance is two-fold.  First, Tyrone asserts that TruBridge failed to perform under the contract such that Tyrone is entitled summary judgment as a matter of law.  Second, TruBridge asserts that it substantially performed its contractual obligations such that it is due judgment as a matter of law.  Because the analysis as to TruBridge's performance goes to both pending motions, this Court will address the issues relating to performance in both motions together.[11]

In support of its position that it performed its contractual obligations, TruBridge shows that from December 1, 2016 to March 2018, it billed and collected $29,279,556.72 in payments from third party payers and patients. (Doc. 112 at 6; PageID.1312).  TruBridge relies on the deposition testimony of Dieffenbach wherein he acknowledged that TruBridge provided insurance follow-up, billing, and collection services to Tyrone and wherein he testified that he believed TruBridge was working to tailor and supplement its system in order to provide Tyrone the services to which it agreed, i.e., submitting claims to payers, appealing denials of payments, billing and collecting payments from patients, trying to reconcile Tyrone's books for bad debt, providing insurance follow-up services, and working on remittances capturing payment information and other clearinghouse data. (*Id*. at 6-9; PageID.1312-15.) TruBridge also relies on the deposition testimony of Joseph

_____

[11] Because the Court has combined the parties' positions as to performance, the facts presented will not necessarily be discussed in the order in which they were presented by the pleadings.

Peluso, Tyrone's CEO ("Peluso"), wherein he testified that TruBridge continued to provide accounts receivable management services until February 2018 and wherein he stated that he assumed that Tyrone complied with all of its responsibility under the accounts receivable management addenda to the Agreement. (*Id*. at 9; PageID. 1315.) Finally, TruBridge relies on the testimony of Jessica Albert (Manager of Patient Financial Services of Tyrone) ("Albert") wherein she admitted that TruBridge provided the services they agreed to provide to Tyrone. (*Id*. at 10; PageID.1316.)

Tyrone does not dispute that TruBridge collected $29,279,556.72 on behalf of Tyrone pursuant to the Amended Agreement. Rather, Tyrone argues that TruBridge failed to perform as a matter of law because it failed to collect as much as $3,984,981 more in claims.[12] (Doc. 108, generally.) It alleges that the failure of TruBridge to properly handle the accounts receivable affected the hospital's financial health and affected Dieffenbachs' working situation and personal health. (Doc. 108 at 8-9; PageID.878-79). In support of its position, Tyrone sets forth a significant number of facts and references a series of documents which detail the problems with TruBridge's handling of Tyrone's billing and collection services. Namely, Tyrone has submitted (among other things) (1) multiple emails between Dieffenbach and TruBridge which detail that the financial position of the hospital

---

[12] Tyrone's motion does not specifically cite this number. Rather, the Court has calculated this amount based on the numbers asserted herein below. This amount is in agreement with the same calculations made by TruBridge. (Doc. 116 at 20; PageID.1493)

was not improving as much as it needed to after TruBridge took over Tyrone's accounts receivable (Doc. 108 at 5-8), (2) an affidavit of Jessica Albert (Doc. 109 at 122-131; PageID.1010-19), (3) copies of correspondences relating to multiple complaints the hospital received from patients regarding their accounts, which ultimately had to be addressed by sending out a letter to all patients apologizing for the "mishandling" of their accounts, but still incorrectly informing parties to contact Tyrone instead of TruBridge' hotline. (Doc. 108 at 10-11; PageID.880-81; Doc. 109 at 133-40; PageID.1021-28), (4) Action Plans proposed by TruBridge that set performance goals in response to continued problems (which Tyrone asserts were not met) (Doc. 109 at 167-70; PageID.1055-58) (4) an Aging Workflow Report dated February 19, 2018 prepared by Juanita Johnson (TruBridge's Manager of Business Services) ("Johnson") and Johnson's "visit recap notes", (Doc. 109 at 159-60; PageID.1047-48) and (5), forty-nine documents produced by TruBridge which can very generally be described as documents referencing problems experienced with the handling of accounts receivable during the contract period. (Doc. 120 at 8-11; PageID.1718-21; Docs. 120-1 to 120-5).

Of significance, Tyrone points out that the Aging Workflow Report showed that as of February 19, 2018, "691 claims with gross charges totaling $1,712,677.23 had been sitting in Tyrone Hospital's claims clearinghouse system for 30 or more days without being billed or otherwise worked by TruBridge, LLC."[13] (Doc. 108 at

---

[13] The termination letter cites to the Aging Workflow Report as indicating that there were "1,061 Medicaid claims which have not been billed by TruBridge, LLC dating back to July, 2017, totaling $2,278,249.20 in charges as of February 19,

13; PageID.883). Johnson's "visit recap notes" from her meeting with TruBridge employees additionally noted that: the process of receiving payments "caused [the TruBridge, LLC employees] to be behind on their main responsibilities in [the] billing flow"; the TruBridge, LLC employees "are not able to complete all of their billing task (sic) and no follow up has been done on billing they submit"; and that she further "[d]iscussed MSP protocol, due to excessive denials from Medicare on COB". (Doc. 108 at 13-14; Page.ID 883-84) (emphasis omitted). Tyrone also relies on a phone call which allegedly took place after this litigation was filed and a follow up email between Johnson and Albert ("Johnson-Albert Call" and "Johnson-Albert Email", respectively). According to Tyrone, during the Johnson-Albert Call, Johnson referenced a large spreadsheet of mishandled claims. The Johnson-Albert Email sent by Johnson requested that Tyrone write off $93,082.13 in claims. (Doc. 108 at 14; PageID.884).

To further, substantiate its claims that TruBridge failed to collect as it was required, Tyrone submits a review of accounts receivable performed by Jessica Albert (Manager of Patient Financial Services of Tyrone)("Albert") which shows Tyrone's "damages total $2,635,504.13 based upon: a. 1,211 insurance accounts totaling $656,009.83 in uncollected fees as of March 29, 2018; b. 3,216 self-pay accounts with a balance due of $1,715,284.80 in uncollected fees as of March 29,

---

2018." (Doc. 108 at 12; PageID.882). However, Tyrone has since acknowledged that Peluso misinterpreted the report. (*Id.*) Notwithstanding the alleged error, Tyrone contends the report still reflects the above mishandled claims. (*Id.*)

2018; and c. 508 Medicaid accounts verified with gross charges totaling $1,768,048.31 and an uncollectible balance in the amount of $264,209.50 as of March 29, 2018."[14] (Doc. 108 at 15; PageID.885) Tyrone additionally contends that the figures Albert previously calculated "do not include untimely-filed insurance claims for 2017 totaling $1,349,476.87 in gross charges related to 1,726 transactions as well as any such claims through March 29, 2018 which were not reflected on Tyrone Hospital's Aged Trial Balance report because they had been written off." (*Id.* at 16; PageID.886). As a result, Tyrone contends TruBridge failed to collect $3,984,981 in claims.

In response, TruBridge acknowledges that at one time or another the parties were dissatisfied with the actions or performance of the other, but that Tyrone's dissatisfaction does not equate to TruBridge's non-performance. It argues that even if the facts presented by Tyrone were true (which it disputes) they fail to establish a breach of contract. (Doc. 116 at 2, 6-13; PageID.1475-86). TruBridge further asserts that the facts presented by Tyrone are pretextual because the events on which Tyrone now relies to justify its termination letter took place after the termination letter was sent. (*Id.* at 14-19; PageID.1487-92). Lastly, TruBridge argues Tyrone's alleged damages are false and that any damages due to TruBridge's failure to

---

[14] Tyrone acknowledges that "the figures for insurance claims include all insurance claims over 60 days even before TruBridge, LLC was engaged, unreconciled insurance over-payments, and claims which were written off due to medical necessity among other possible adjustments" but also that "[b]ecause of the strict time deadlines on Medicaid claims, the figures for such claims is not subject to change over time and remain accurate." (Doc. 108 at 15; PageID.885; Doc. 109 at 122-24; PageID.1010-12).

16

timely bill claims is statistically insignificant considering TruBridge collected more than $29 million pursuant to the Agreement. (Doc. 116 at 18, 20-22; PageID.1491, 1493-94).

Both parties assert that the requisite legal measurement of performance is whether a party substantially performed. (*See* Doc 112 at 12; PageID.1324; Doc. 120 at 4-6: PageID.1714-16).   In support of its position that it substantially performed, TruBridge primarily relies on three cases: *Bay City Const. Co. v. Hayes*, 624 So.2d 1031, 1034 (Ala. 1993); *ADTRAV Corp. v. Duluth Travel Inc.*, 2018 WL 447417 (N.D. Ala. January 17, 2018); and *Bruner v. Hines*, 324 So.2d 265 (1975). In *Bay City*, the Alabama Supreme Court stated as follows:

> We stated in *Cobbs v. Fred Burgos Constr. Co.,* 477 So.2d 335, 338 (Ala.1985), that whether a party has substantially performed a promise under the contract is a question of fact to be determined from the circumstances of each case. Furthermore, "substantial performance" of a contract does not contemplate exact performance of every detail, but performance of all important parts. *Mac Pon Co. v. Vinsant Painting & Decorating Co.*, 423 So.2d 216 (Ala.1982)

*Bay City Const. Co. v. Hayes*, 624 So.2d 1031, 1034 (Ala. 1993).  In *Duluth*, the Court described substantial performance under Alabama Law as follows:

> "If a plaintiff substantially performs, 'immaterial deviations will not prevent recovery of the contract price, less the amount required to indemnify for injuries sustained by such deviations.' " *ECR Properties, LLC v. Camden County Dev., LLC*, 998 F. Supp. 2d 1295, 1304 (M.D. Ala. 2014) (quoting *Huffman–East Dev. Corp. v. Summers Elec. Supply Co.*, 288 Ala. 579, 263 So.2d 677, 680 (1972)). Furthermore, "[a] material breach of a contract 'is one that touches the fundamental purposes of the contract and defeats the object of the parties in making the contract.' " *Bentley Systems, Inc. v. Intergraph Corp.*, 922 So. 2d 61, 93 (Ala. 2005) (quoting *Sokol v. Bruno's, Inc.*, 527 So.2d 1245, 1248 (Ala. 1988)). " 'Substantial performance is the antithesis of material breach. If a breach is material, it follows that substantial performance

17

has not been rendered.' " *Harrison v. Family Home Builders, LLC*, 84
So. 3d 879, 889 (Ala. Civ. App. 2011) (quoting John D. Calamari &
Joseph M. Perillo, THE LAW OF CONTRACTS § 11.18(b) (4th ed.
1998)). " ' "Breach" consists of the failure without legal excuse to
perform any promise forming the whole or part of the contract.' "
*Hanuman, LLC v. Summit Hotel OP, LP*, No. 2:13-CV-02234-HNJ,
2017 WL 4508158, at *4 (N.D. Ala. Oct. 2, 2017) (quoting *McGinney v.
Jackson*, 575 So. 2d 1070, 1071 (Ala. 1991)).

*Duluth* at *8. "Whether or not a given breach is so material or essential may be

frequently a question of fact to be determined by the jury, yet if in a particular case

the question is so clear as to be decided only in one way, it is a question of law for

the court." *Id.* quoting *Harrison v. Family Home Builders, LLC*, 84 So. 3d 879, 889

(Ala. Civ. App. 2011). Tyrone does not contest the applicability of the case law

relied on by TruBridge. It does, however, assert that those cases support that

substantial performance is a jury question and should not be resolved on summary

judgment. (Doc. 120 at 4-6; PageID.1714-16).

A review of the relevant pleadings and supporting evidence submitted by the

parties establishes that the "fundamental purpose" of the Amended Agreement was

to obligate TruBridge to handle the billing and collection services for Tyrone. There

is no question that, to some extent, TruBridge performed under the Amended

Agreement. Indeed, the collection of over $29 million in claims is not insignificant.

Moreover, there is no dispute that the Amended Agreement did not contain

performance metrics, such that TruBridge's failure to collect a minimum amount of

claims would automatically amount to a breach of its obligations. Further, a large

portion of the factual circumstances presented by Tyrone, while certainly refuting

that TruBridge's performance was perfect, fail to raise a question of material fact

that it failed to perform "all the important parts". See *Bay City Const. Co.*, 624 So.2d at 1034. More specifically, the fact that patients complained over the handling of their accounts, the fact that the billing issues impacted Dieffenbach's working environment, the fact that dissatisfied account holders were the instructed to call the hospital instead of TruBridge's toll free customer service line, while all disputed, are not particularly persuasive to show that TruBridge failed to substantially perform. Rather, these factual circumstances more strongly support the type of immaterial deviations that do not defeat substantial performance.

Nevertheless, the relevant pleadings and supporting documents also show that from early 2017 until February 2018, there were problems with TruBridge's handling and/or mishandling of Tyrone's accounts receivable. In that respect, the record reflects that on multiple occasions Tyrone expressed concerns to TruBridge that its collections were lower than anticipated, that in response to Tyrone's concerns, TruBridge proposed Action Plans (which the parties dispute were met), and that at the time of termination, the parties were actively attempting to renegotiate a contract that would include performance metrics (among other things). More significantly, Tyrone has shown, per the Aging Workflow Report, that at the time it sent the termination letter, there were 691 claims that had been sitting in Tyrone Hospital's claims clearinghouse system for 30 or more days without being billed or otherwise worked by TruBridge, LLC. These facts place in dispute whether TruBridge was substantially performing. Further, because the damages claimed by Tyrone are the amounts which it claims TruBridge failed to

collect, those claimed damages also materially impact any analysis of whether TruBridge substantially performed. Based on the documents before this Court the actual amount of claims that TruBridge allegedly failed to collect under the contract ranges from $93,082.13 to $3,984,981, with possible calculations of $797,111.63 (Doc. 112 at 17-21; PageID.1323-27) and $365,114.25 (Doc.116 at 21; PageID.1494) in between.[15] Because the number and amount of claims TruBridge failed to collect "touches the fundamental purposes of the contract" and because the parties dispute the number and amount of claims which TruBridge failed to collect, this case is not "so clear as to be decided only in one way". See *Duluth* at *8. Accordingly, whether or not TruBridge substantially performed is a question of fact to be determined by a jury.

The Court has not ignored TruBridge's additional contentions that Tyrone's reasons for termination were pretextual or that the Johnson "visit recap notes" and the Johnson-Albert Call contain hearsay that is inadmissible. However, neither of those arguments defeat the analysis above.[16] Despite the fact that Tyrone may have been discussing its termination of the Amended Agreement with TruBridge

---

[15] The Court notes that the $797,111.63 and $365,114.25 figures are presented by TruBridge, not Tyrone. This Court is not citing these figures to suggest in any way that TruBridge might owe those specific amounts. Rather, the Court references these amounts to show that the extent of the allegedly mishandled claims is clearly disputed, and that fact, not the actual amounts presented, supports that this is not a case wherein substantial performance should be determined as a matter of law.
[16] Because this Court's conclusion that a question of fact exists is based on the record even without considering the Johnson visit recap notes or the Johnson-Albert Call, this Court need not address the admissibility of those notes or the call at this time.

prior to its actual termination does not wholly undermine the reasons stated by Tyrone for its termination. Namely, as stated above, the facts presented show a pattern of Tyrone being dissatisfied with TruBridge's performance, an effort to cure problems (that neither party denies existed) to which TruBridge responded with Action Plans (which the parties dispute were met) and the reality that regardless of whether Peluso misread or overstated the amount of outstanding claims as indicated by the Aging Workflow Report, there were, in fact, outstanding claims per the report. These facts raise a material dispute as to whether, at the time the termination letter was sent, TruBridge had substantially performed, even without considering those events which TruBridge asserts took place thereafter, including the Johnson-Albert correspondences or the Johnson "visit recap notes". As such, a question of material fact as to whether TruBridge substantially performed remains, so as to defeat summary judgment.

TruBridge's position that its performance of collecting approximately $29 million for Tyrone renders statistically insignificant any losses Tyrone may have suffered as a result of its mishandling its contractual obligations is also not lost on the court. However, as explained above, the amount which TruBridge failed to collect in this action is not the result of an immaterial deviation such as an error or miscalculation. Rather, the amount which TruBridge failed to collect is directly material to TruBridge's performance. Since the amount of losses Tyrone may have suffered is disputed, the facts presented do not unequivocally establish that the amount of claims which TruBridge failed to collect is statistically insignificant. It is

not this court's function to weigh the evidence or to determine the truth of the dispute, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. Based on the facts presented in this action, it cannot be said that there is no question of material fact on the issue of performance. As a result, neither party is entitled to judgment as a matter of law on their respective breach of contract claims.[17] Moreover, because summary judgment is not warranted as to the breach of contract claims, the court need not determine the amount of damages to which either party may be entitled.

## B. Limitation of Liability

To the extent that summary judgment is not granted as to the breach of contract claims, TruBridge also seeks summary judgment in its favor barring

---

[17] The court notes that TruBridge additionally asserts that it is entitled to summary judgment as to Tyrone's counterclaims because even if it could prove a failure of TruBridge to perform, it still cannot show damages, a required element of its cause of action, because it did not take reasonable efforts to prevent its damages. (Doc. 112 at 24; PageID.1330). In support of its position, TruBridge points out that when Tyrone terminated the contract, the parties were in the process of renegotiating the Amended Agreement and that because Tyrone chose to terminate rather than continue with the renegotiating, it failed to prevent its losses. (*Id*.) TruBridge's arguments are not compelling. First, the fact that Tyrone discussed the performance issues with TruBridge and attempted to renegotiate prior to its termination refutes that it altogether failed to take reasonable efforts to prevent its damages. Second, the facts presented show that the parties disagree as to why the renegotiating ended. TruBridge contends that the parties reached an agreement on material issues, but Tyrone terminated prior to the new contract being finalized. (*Id*.) However, the deposition testimony relied on by TruBridge also provides that Tyrone believed that TruBridge was responsible for sending it a draft of the new contract, but failed to do so. (*Id*.) Finally, aside from the factual disputes, "[w]hether a party has sufficiently mitigated his damages is a question of fact." *Carnival Cruise Lines, Inc. v. Goodin*, 535 So.2d 98, 103 (Ala. 1988) (citations omitted).

Tyrone's claim for damages. For cause, TruBridge asserts that the recovery of damages is precluded by a limitation of liability clause in the contract. (Doc. 112 at 26-28; PageID.1332-34). TruBridge argues that the conspicuous, all capitalized limitation of liability in the Amended Agreement is both enforceable under Alabama law and not unconscionable. (Doc. 112 at 26-28; PageID.1332-34). Tyrone responds that it is not seeking incidental or consequential damages. Rather, it seeks only direct compensatory damages as a result of TruBridge's failure to perform the services described by the contract. As such, it argues that its damages are not precluded by the limitation of liability clause, but rather are the exact type of damages that are allowed because the clause limits TruBridge's liability "to providing the services described [per the Agreement]". (Doc 120 at 13-14; PageID.1723-24). Nevertheless, Tyrone argues that if this Court is inclined to agree with TruBridge that the liability provision precludes *any* liability, then the provision is ambiguous. (*Id*. at 14-17; PageID.1724-27). In reply, TruBridge states the limitation of liability provision "unambiguously and conspicuously limits TruBridge's liability under the Amended Agreement to the provision of the services described under the Amended Agreement" and that "Tyrone Hospital's management all testified that TruBridge performed its obligations under the Amended Agreement" such that "Tyrone Hospital's damages claims are foreclosed by the limitation of liability provision." (Doc. 122 at 9; PageID.1959).

Alabama law recognizes the freedom to contract and upholds "clearly manifested limitations" in a contract. *Standifer v. Best Buy Stores, L.P.*, 364

F.Supp.3d 1286, 1295 (N.D. Ala. 2019) citing to *Campbell v. S. Roof Deck Applicators, Inc.*, 406 So.2d 910, 913 (Ala. 1981). Tyrone does not argue that the limitation of liability is unenforceable per Alabama law. Nevertheless, it is well established that limitation of liability clauses are enforceable. *See Colonial Bancgroup Inc. v. PricewaterhouseCoopers, LLP*, 2016 WL 9686250, *8 (M.D. Ala. Aug. 25, 2016) ("... Contract provisions that bar consequential damages.... are fully enforceable in Alabama.... *Saia Food Distribs. v. SecurityLink*, 902 So. 2d 46, 50, 55 (Ala 2004) (enforcing a limit of liability clause as to damages arising from alleged breach of contract and negligence); *Puckett, Taul & Underwood, Inc. v. Schreiber Corp.*, 551 So. 2d 979, 982-82 (Ala. 1989) (... commercial parties may contract freely to limit the remedies available to them; ....). Tyrone has additionally failed to dispute that the limitation of liability clause at issue in this action is unconscionable. *See Fleming Farms v. Dixie AG Supply, Inc.*, 631 So.2d 922 (Ala.1994) ("Once the party seeking to enforce a limitation-of-liability clause makes a prima facie showing that the clause is not unconscionable, the burden shifts to the plaintiff to present substantial evidence to the contrary.") Rather, Tyrone asserts that the clause on its face does not preclude the damages it seeks or, in the alternative, it must be ambiguous.

As explained by this Court in *Sloan v. Cunningham*, 2017 WL 5894541, *8 (S.D. Ala. Nov. 29, 2017):

> "If the court determines that the terms [of the contract] are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written." *Cavalier Mfg., Inc.*, 862 So. 2d at 640

(quoting *Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000)). Pursuant to Alabama law, construal of unambiguous agreements properly falls within the court's purview. *Steward v. Champion Int'l Corp.*, 987 F.2d 732, 734 (11th Cir.1993) (citing *Terry Cove North, Inc. v. Baldwin County Sewer Auth., Inc.*, 480 So.2d 1171, 1173 (Ala. 1985)). See also *Warrior Drilling & Eng'g Co. v. King*, 446 So.2d 31, 33 (Ala. 1984) ("With regard to the construction of instruments, this court has said that if an instrument is unambiguous, its construction and effect are questions of law.").

On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. *See Voyager Life Ins. Co. v. Whitson*, 703 So.2d 944, 948 (Ala.1997); *see also Extermitech*, 951 So.2d at 694 ("Some of this Court's decisions indicate that, once the court determines that a contract is ambiguous, it is for the finder of fact to resolve the ambiguity. However, ... the court, as a matter of law, should apply rules of construction and attempt to resolve any ambiguity in the contract before looking to factual issues to resolve the ambiguity.").

The limitation of liability clause states as follows:

> **Liability:** TRUBRIDGE'S LIABILITY FOR FURNISHING SERVICES UNDER THIS AGREEMENT SHALL BE LIMITED TO PROVIDING THE SERVICES DESCRIBED. TRUBRIDGE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES INCURRED BY CUSTOMER AS A RESULT OF THE LOSS OF USE OF THE SERVICES, OR ANY PART OR COMPONENT THEREOF, OR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM OR OCCASSIONED BY THE FAILURE OF TRUBRDIGE TO PERFORM ANY OBLIGATION UNDER THIS AGREEMENT.

(Doc. 110-1 at 6; PageID.1119). To the extent that TruBridge seeks summary judgment as to any claims of Tyrone for incidental or consequential damages,

summary judgment is granted.  Incidental and consequential damages are addressed by the second sentence of the limitation provision which states in pertinent part, "TruBridge shall not be liable […] for any incidental or consequential damages resulting from or occasioned by the failure of TruBridge to perform any obligation under this Agreement." (Doc. 110-1 at 6; PageID.1119).  This language is not ambiguous and limits the identified damages as a matter of law. Moreover, Tyrone specifically concedes that it does not seek such damages.  As a result, summary judgment is granted in favor of TruBridge as to any claims for incidental and consequential damages.

To the extent that TruBridge seeks summary judgment so as to preclude any or all liability or damages, the same is denied.  As an initial matter, this Court has reviewed the arguments of the parties on this issue repeatedly.  Unfortunately, it is unclear whether TruBridge is asserting that the limitation of liability precludes Tyrone from seeking *any* direct damages as a result of an alleged breach or if it is asserting that the limitation provision allows for the recovery of direct damages as a result of a breach, but Tyrone is precluded from recovery of the same in this instance because TruBridge has satisfied its burden at summary judgment as to its breach of contract claim.[18]  If the latter argument is being made, then summary

---

[18] To be fair, TruBridge's motion for summary judgment asserts that the limitation precludes the recovery of damages even if, this Court denied TruBridge's motion with respect to the breach of contract claims.  (Doc. 112 at 26-28; PageID.1332-34). However, after Tyrone responded asserting that its claims for direct compensatory damages were not barred by the clause, but were specifically permitted, TruBridge replied that the first sentence of the clause precluded damages because it performed under the contract.  (Doc. 122 at 9; PageID.1959).  As a result, it is unclear whether

judgment is denied because this Court has previously determined that summary judgment is not warranted on the breach of contract claim. If the former interpretation is the correct one, then this Court must determine if the first sentence of the provision is ambiguous.

The relevant portion of the provision states "TruBridge's liability for furnishing services under this Agreement, shall be limited to providing the services described." (Doc. 110-1 at 6; PageID.1119). The Court does not find this language ambiguous. Rather, the plain language dictates that TruBridge is liable for providing the services described. This plain reading is supported by the second sentence of the provision. If the first sentence was meant to bar Tyrone from *any* recovery of damages whatsoever, the second sentence would be unnecessary as *any* liability would certainly include liability for incidental and consequential damages. Moreover, if the limitation of liability were meant to preclude direct compensatory damages as a result of TruBridge's failure to perform, then the second sentence which only limits incidental or consequential damages as a result of a failure to perform, certainly falls short. The better interpretation allows for the two sentences to be read in harmony. Specifically, the first sentence limits TruBridge's liability to only liability for providing its services and the second sentence waives any incidental and consequential damages resulting from or occasioned by the failure of TruBridge to perform the same. As a result, to the extent that TruBridge

---

TruBridge is asserting that direct compensatory damages are precluded under the first sentence of the limitation clause by its language or because TruBridge alleges it performed.

is asserting that the limitation precludes any recovery of damages, this Court finds that the clause does not preclude direct compensatory damages for failure to perform its contractual obligations.

The Court notes that the same conclusion would be reached had the court found that the clause was ambiguous based on the premise that the parties in this action offered two differing, but plausible interpretations of the language at issue. When an ambiguity exists, this Court is charged with evaluating the contract on its face and applying the rules of contract construction in an effort to resolve ambiguities. *See Vesta Fire Ins. Corp.*, supra. In determining whether a term is ambiguous, "an isolated sentence of the policy should not be construed alone, but in connection with other provisions of the said policy in order to arrive at a construction reasonably calculated to accomplish the intent and purpose of the parties." *Mega Life and Health Ins. Co., v. Pieniozek*, 516 F.3d 985, 991 (11th Cir. 2008) quoting *N. River Ins. Co. v. Jackson*, 278 Ala. 604, 179 So.2d 731, 733 (1965). Applying the rules of contract construction would result in the conclusion that the provision does not preclude Tyrone from seeking any damages. Specifically, the terms used are not ambiguous in their own right and the plain language of the provision warrants the above conclusion. Moreover, as explained hereinabove, an interpretation of the first sentence to be a complete bar to liability and damages would be inconsistent with the remaining language of the provision. Had TruBridge intended to preclude any recovery of damages, including direct compensatory damages, then it could have included such language in the provision.

Instead, it limited its liability to the services it provided and then waived non-direct damages.

D. Unpaid Invoices

TruBridge additionally seeks summary judgment as to two invoices from March and April for services rendered by TruBridge to Tyrone in the amount of $117,997.24. (Doc. 112 at 28; PageID.1134). In support of its position, TruBridge points out that it was required to collect for Tyrone pursuant to its contractual obligations and Tyrone was obligated to pay TruBridge 3.75% of all sums collected under the same. (Doc. 112 at 14; PageID.1320). TruBridge acknowledges that the invoices from March and April total $139,997.24, but seeks summary judgment as to only $117,997.24. (*Id.*) For support, TruBridge has provided this Court with the relevant invoices (Page ID.1244-46) and an email from Bains Fleming to Walton Jackson, opposing counsel in this action, which indicates that Tyrone does not dispute that it owes TruBridge $117,997.24. In response Tyrone argues that it disputes the last two invoices "in their entirety" as supported by the Affidavit of William Crowe and seeks to strike the email correspondence and moves *in limine* to preclude any reference to the email to the jury. (Doc. 120 at 19-22; PageID.1729-32). In reply, TruBridge argues that the email need not be stricken or precluded *in limine*, but even if it were, then the evidence of record remains unrefuted that Tyrone owes TruBridge $117,997.24 based on the Crowe affidavit. Specifically, the affidavit as quoted by Tyrone, states as follows:

> Tyrone Hospital has paid all invoices of TruBridge, LLC for services
> rendered pursuant to the Agreement which is the subject of this

> litigation except the last two invoices dated March 9 and 29, 2018 in
> the respective amounts of $84,800.96 and $55,196.28 totaling
> $139,997.24. Of this amount, Tyrone Hospital disputes $22,240.65
> related to a cost report and rate settlements which it contends should
> not have been included in the above bills, and Tyrone Hospital claims a
> right of setoff as to the remaining amount claimed by TruBridge, LLC.

(Doc. 109-5; PageID.1007). This Court does not find it necessary to analyze whether

the email between Fleming and Jackson should be stricken for purposes of

summary judgment, because without considering the same, there are no facts

presented that Tyrone does not owe TruBridge $117,997.24, for previous services

rendered.[19] Tyrone does not dispute the amount which TruBridge claims to have

collected on its behalf as evidenced by the invoices or that it owes TruBridge 3.75%

of those collections. It only disputes that of the total amount invoiced, it does not

owe $22,240.65. As such, considering the facts in a light most favorable to Tyrone,

this Court finds that Tyrone has not shown that a question of material fact exists

with regard to the $117,997.24.[20]

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff's motion for

summary judgment should be DENIED in part and GRANTED in part. Specifically,

TruBridge's motion is denied with respect to its breach of contract claim, granted as

to any claims for incidental or consequential damages, and granted as to the

---

[19] For the same reason, Tyrone's request for a ruling on its position as a motion *in limine*, is premature.

[20] Tyrone additionally argues that it is entitled to a right of setoff as to the $117,997.24 claimed by TruBridge. (Doc. 108 at 9; PageID.879). Because this Court has denied the parties' respective motions for summary judgment with respect to their breach of contract claims, any determination as to a setoff is premature.

outstanding invoices in the amount of $117,997.24. Defendant's motion for summary judgment is DENIED.

   **DONE** and **ORDERED** this 30th day of March, 2020.

                                        /s/ Callie V. S. Granade
                                        SENIOR UNITED STATES DISTRICT JUDGE