## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **TRUBRIDGE, LLC,** ) | |
| ) | |
| **Plaintiff/Counterclaim Defendant,** ) | |
| ) | **CASE NO.:  1:18-cv-00141-CG-C** |
| **v.** ) | |
| ) | |
| **TYRONE HOSPITAL,** ) | |
| ) | |
| **Defendant/Counterclaim Plaintiff.** ) | |
| _____ ) | |

### MOTION TO EXCLUDE TESTIMONY OF DANIEL M. THIRY

Pursuant to Rules 26(a)(2) and 37(c)(1) of the Federal Rules of Civil Procedure and Rule 702 of the Federal Rules of Evidence, Plaintiff/Counterclaim-Defendant TruBridge, LLC ("TruBridge") hereby moves the Court to exclude the report and testimony of Daniel M. Thiry, Defendant/Counterclaim-Plaintiff, Tyrone Hospital's designated expert witness. In support of this Motion, TruBridge states as follows:

### BACKGROUND

Thiry is the managing principal of Revenue Cycle Solutions, LLC ("RCS"). In August 2017, RCS was hired by Tyrone Hospital to conduct a broad hospital-wide assessment for the purpose of assisting Tyrone Hospital in identifying opportunities for standardizing processes and improving financial performance with respect to the hospital's overall revenue cycle activities. Specifically, RCS evaluated the hospital's processes concerning patient access, case management, hospital information management (HIM), and patient financial services by conducting an onsite observation, discussing matters with select department personnel, and reviewing pertinent system reports and documents. In October 2017, RCS prepared a *Revenue Cycle Assessment of Hospital*

{05324617.2}

*Based Services* (the "Revenue Cycle Assessment") summarizing its findings for Tyrone Hospital. In the Revenue Cycle Assessment, RCS made several recommendations for improving Tyrone Hospital's financial performance, including, *inter alia*, improving its operations in patient access, charge processing, customer relationship management (CRM), HIM, claim denials, and patient financial services. As Thiry testified, the Revenue Cycle Assessment was prepared to assess Tyrone Hospital's overall revenue cycle operation, regardless of how specific functions are performed or who had the responsibility to perform those functions. (Doc. 129-1, PageID.2032). In particular, the Revenue Cycle Assessment was not an evaluation of TruBridge or whether TruBridge was properly performing billing and collection services for Tyrone Hospital. (*Id.*). As explained by Thiry:

> Q:    You looked at really the hospital as an overall functioning business unit; right?
>
> A:    Correct
>
> Q:    And you looked at the revenue cycle process from patient encounter to final billing?
>
> A:    Yes.
>
> Q:    You identified certain areas as part of your 2017 assessment that they could improve?
>
> A:    Yes.
>
> Q.:   Did you then get into the detail of what TruBridge was doing or not doing?
>
> A:    By way of producing the assessment report itself or subsequently in preparation for this?
>
> Q:    When you did the assessment did you look at what TruBridge was doing or not doing that you thought was wrong?
>
> A:    Not in particular. I know TruBridge folks did participate. They were aware of our presence. They did request and subsequently participated in our

review. In our questions and answers they were there. To that extent they did participate in this.

To some extent within this overall operational detail report there may be some reference to TruBridge's functions versus internal functions. More specifically, it might relate to some of these opportunity areas where if certain things were better aligned and better automated and better sequenced, that could be part of the solution.

Q:      I guess my point is in October of 2017 you were not looking at TruBridge and saying this is what they were required to do, they didn't do X, Y or Z?

A:      That's correct.

Q:      You really weren't looking at it from a contractual basis either to determine whether or not TruBridge's performance was deficient; right?

A:      Correct.

(Doc. 129-1, PageID.2039-2040).

        In February 2018, a couple of months after Tyrone Hospital received the Revenue Cycle Assessment, the hospital terminated its contract with TruBridge (as amended, the "Amended Agreement"). The following month, in March 2018, Tyrone Hospital hired RCS to provide revenue cycle management services for the hospital. (Doc. 129-1, PageID.2092-2093). Then, following the commencement of this litigation, Tyrone Hospital retained Thiry as an expert in this case.

        According to the Tyrone Hospital's expert disclosures made pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure ("Rule 26(a)(2)"), Thiry is expected to testify regarding TruBridge's performance or lack thereof under the Amended Agreement; the financial impact TruBridge's breach of the Amended Agreement had on Tyrone Hospital; Tyrone Hospital's damages as a result of TruBridge's breach of the Amended Agreement; the industry standards related to hospital revenue cycles, collections, accounts receivable, and financial health; and generally about the facts of the relationship between TruBridge and Tyrone Hospital.

In conjunction with its expert disclosures, Tyrone Hospital produced a *Preliminary Report* (the "Preliminary Report", a true and correct copy of which can be found at Doc. 129-2, PageID.2096-2102) completed by Thiry. As Thiry testified, the Preliminary Report is essentially a three-page summary of the Revenue Cycle Assessment. (Doc. 129-1, PageID.2014-2015). In addition to summarizing the Revenue Cycle Assessment, the Preliminary Report includes the following statements under two headings titled "Findings" and "Conclusion":

> RCS's assessment revealed and confirmed that many of the basic department functions were not performed in a timely, accurate and appropriate manner causing significant cash flow delays, unnecessary expenses and sizable reimbursement losses. The revenue cycle performance issues should have and could have been identified by most revenue cycle management leaders and immediately addressed for corrective action. In instances when negative performance trends continue for 2-3 successive months, senior management should have been notified and an immediate corrective action plan should have been implemented.
>
> *        *        *
>
> Based upon RCS's review of the [Amended Agreement] when compared to the revenue cycle operational deficiencies identified in our report, it is clear that TruBridge has failed to adequately perform the essential duties required to fulfill this revenue cycle management role.

(Doc. 129-2, PageID.2098).

In December 2019, Tyrone Hospital supplemented the Preliminary Report by producing a spreadsheet (the "Supplemental Report" or, together with the Preliminary Report, the "Report", a true and correct copy of which can be found at Doc. 129-3, PageID.2104-2198) summarizing the amount of Tyrone Hospital's losses resulting from TruBridge's breach of the Amended Agreement.  However, Thiry testified that (a) he did not calculate the figures contained in the Supplemental Report; (b) he did not verify the Supplemental Report figures by logging into Tyrone Hospital's electronic health record system; and (c) he did not analyze or verify whether the figures contained in the Supplemental Report actually resulted from TruBridge's purported performance

failures. (Doc. 129-1, PageID.2018-2026, 2065-2071, 2074-2080, 2084-2085). Instead, Thiry simply used figures provided to him by Tyrone Hospital and inserted them into a spreadsheet to estimate the amount of payments Tyrone Hospital did not collect because of TruBridge's purported contractual breach. (*See id.*).

As explained herein, Thiry's Report and proposed testimony should be excluded under Rule 37(c)(1) for failing to comply with Rule 26(a)(2) and excluded under Rule 702 because Thiry's opinion is based on an unreliable methodology and fails to assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

## ARGUMENT

### I. Thiry's Report and testimony should be excluded under Rule 37(c)(1) for failure to make the disclosures required by Rule 26(a)(2).

Neither Thiry's Preliminary Report nor his Supplemental Report contain the information required of retained expert witness reports under Rule 26(a)(2)(B). Thus, Thiry's Report and testimony must be excluded under Rule 37(c)(1).

### A. Thiry's Report is deficient under Rule 26(a)(2).

Pursuant to Rule 26(a)(2)(B), a witness retained to provide expert testimony must provide a written report containing:

> (i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii)    the data or other information considered by the witness in forming them;

> (iii)   any exhibits that will be used to summarize or support them;

> (iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and

(vi)    a statement of the compensation to be paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B).

Thiry's Report is deficient under Rule 26(a)(2)(B)(i) and (ii).[1] Thiry's Preliminary Report is comprised of two pages that summarize RCS's October 2017 Revenue Cycle Assessment[2] and an additional half page that provides broad, unsupported, and conclusory statements under two sections respectively titled "Findings" and "Conclusion". The Preliminary Report does not provide the "basis and reasons" for the any of Thiry's statements in the "Findings" and "Conclusion" sections and does not state with any level of specificity the "data or other information considered" by Thiry. The Supplemental Report, which is simply a spreadsheet of figures provided by Tyrone Hospital to estimate the hospital's alleged damages, is also devoid of this required information.

The advisory committee notes to Rule 26(a)(2) provide that an individual retained to provide expert testimony "must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor." In evaluating whether an expert report meets these requirements, courts have explained:

> An expert report is adequate when it is "sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced." *Heed v. Binder*, 165 F.R.D. 424, 429 (D.N.J.1996); see also *Acosta v. Electrolux North America*, No. 08–60213–CIV,

---

[1] Of lesser significance to this Motion, the Report is also technically deficient under subsections Rule 26(a)(2)(B)(vi) and (v). In particular, the Report does not disclose Thiry's compensation for this case, and while the Report provides that Thiry has not testified as an expert in any cases during the previous four years, Thiry's deposition testimony indicated otherwise. (*See* Doc. 129-1, PageID.2009-2011).

[2] The Revenue Cycle Assessment, which Thiry testified was not prepared for this litigation, was not attached to the Preliminary Report or Tyrone Hospital's expert disclosures. (*See* Doc. 129-1, PageID.2031).

2008 WL 5246160, at *5 (S.D. Fla. Dec.16, 2008) ("[A]n expert report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial[.]" (internal quotation marks and brackets omitted)). The *Reed* court further explained that the first requirement of the Rule is designed to elicit both "'how' and 'why' the expert reached the conclusions and opinions to be expressed." *Reed*, 165 F.R.D. at 428 n. 5.

*Goodbys Creek, LLC v. Arch Ins. Co.*, No. 3:07-CV-947-J-34HTS, 2009 WL 1139575, at *1 (M.D. Fla. Apr. 27, 2009) (striking an expert's report as deficient under Rule 26 because the report was "[i]mpermissibly vague as to both opinions and bases").

The Report does not disclose the "how" or the "why" Thiry reached his findings or conclusions. As previously explained, Thiry makes the following findings and conclusions in the Preliminary Report: (1) RCS's assessment revealed and confirmed that many of the basic department functions were not performed in a timely, accurate and appropriate manner causing significant cash flow delays, unnecessary expenses and sizable reimbursement losses; (2) the revenue cycle performance issues should have and could have been identified by most revenue cycle management leaders and immediately addressed for corrective action; (3) in instances when negative performance trends continue for 2-3 successive months, senior management should have been notified and an immediate corrective action plan should have been implemented; and (4) based upon RCS's review of the [Amended Agreement] when compared to the revenue cycle operational deficiencies identified in our report, it is clear that TruBridge has failed to adequately perform the essential duties required to fulfill. (Doc. 129-2, PageID.2098).

Nowhere in the Preliminary Report, however, does Thiry explain how he reached these findings and conclusions. Thiry conceded this in his deposition. Specifically, Thiry testified that the Preliminary Report (a) does not list any of the basic department functions in the report that were not performed in a timely, accurate, or appropriate manner; (b) does not list how those purported performance deficiencies caused significant cash-flow delays, unnecessary expenses or

sizable reimbursement losses; and (c) does not identify any specific instance of TruBridge failing to perform its required duties (Doc. 129-1, PageID.2052-2059. 2061-2064).

Simply put, there is nothing in Thiry's Report explaining how or why he reached his findings and conclusions. Instead, they are wholly unsupported and conclusory. Looking closer at Thiry's conclusory opinion in the Preliminary Report that "TruBridge failed to adequately perform the essential duties required to fulfill this revenue cycle management role," the Report contains zero details or facts supporting this opinion or explaining what TruBridge did or did not do that allegedly resulted in a breach of the Amended Agreement. This is unsurprising since Thiry testified that he never assessed whether TruBridge performed or failed to perform any of its obligations under the Amended Agreement. (Doc. 129-1, PageID.2039-2040, 2050-2052, 2056-2057).[3] In his deposition, Thiry was questioned multiple times about the lack of detail and specific findings in his Report. In one exchange, Thiry admitted that his Report does not make any findings as to what TruBridge did wrong:

> Q:   Do you have a list of your findings as it relates to TruBridge's performance regarding Tyrone Hospital?
>
> A:   Well, our report really wasn't in there to evaluate TruBridge. It was intended to assess the operational – the rev cycle operation for Tyrone Hospital, regardless of who or how the functions were being performed.
>
>     We really looked at the results without regard necessarily to who was doing what – at least, you know, in the way we prepared this report.
>
> Q:   Well, I mean is it fair to say in this preliminary report you don't say TruBridge should have done X or TruBridge was required to do X and TruBridge did not perform X?
>
> A:   In the preliminary report?
>
> Q:   Correct.

---

[3] Tellingly, when asked whether he would testify during his deposition or at trial that TruBridge breached the Amended Agreement, Thiry answered "I don't think so." (Doc. 129-1, PageID.2086).

A:      Yes. There is – it's not given in detail. It's just a higher level comment with regards to the findings section.

Q.      The way that I looked at what you said – you said basic department functions. You don't list those basic department functions; do you?

A.      Not in the preliminary report, no.

Q.      There is not in this report numerous findings related to TruBridge's performance?

A.      There are – do you want my opinion here?

Q.      No. I'm just saying you don't say that Trubridge failed to properly submit a claim on the proper date; right?

A.      Not at that level of detail, No. Again, we're looking at the results. You look at these items under background in section two of the preliminary report, specifically what might be related to TruBridge would be things like unbilled AR. From my recollection, I believe they were carrying three or four times the national best practice amounts in unbilled AR. Their aged AR over 90 days was well in excess of the industry accepted norms. The denials were again, well beyond the accepted norms for that size facility.

So those things in my opinion are directly related to the TruBridge performance and what they were in there to oversee and manage.

Q:      But you don't say that in this report is my point.

A:      Well, okay.

Q:      Right?

A:      I mean, I'm inferring it. It's in the summary here in the second section and then it's referenced at a cursory level in findings. No. I didn't lay them all out item per item, you are correct.

(Doc. 129-1, PageID.2032-2034). Thiry's statement that his report is "inferring" his opinion is insufficient. This Court's analysis in *Harrison Bros. Dry Dock & Repair Yard v. Pan Agri Int'l, Inc.*, No. CIV.A. 08-0486-WS-B, 2009 WL 3273926, at *3 (S.D. Ala. Oct. 9, 2009) is instructive on this point. In excluding witness testimony based on an expert report that was similarly deficient to Thiry's Report, the Court explained:

> The only opinion expressly stated in Schiehl's report is that the plaintiff's charges "are excessive of the norm for this type of work across the industry." The report also contains the implicit opinion that the charges contain "numerous duplications." The defendants suggest the report also "signaled" that Schiehl would opine as to delays in the plaintiff's completion of the work. (Doc. 99 at 10). It is questionable whether the report does even that, but in any event a subliminal "signal" that the expert holds some secret opinion is not enough to satisfy Rule 26; instead, an explicit statement of the content of the opinion is required, and that patently is lacking. The plaintiff was not required to guess as to the intent behind Schiehl's veiled language.

*Harrison Bros. Dry Dock & Repair Yard v. Pan Agri Int'l, Inc.*, No. CIV.A. 08-0486-WS-B, 2009 WL 3273926, at *3 (S.D. Ala. Oct. 9, 2009). Thiry's testimony demonstrates the same deficiencies in his Report that this Court found in *Harrison Bros. Dry Dock & Repair Yard,* in which an expert was excluded because his report only contained his "implicit opinion." *Harrison Bros. Dry Dock & Repair Yard*, at *3.  An explicit statement of the content of the expert's opinion is required, and Thiry admits that his report does not contain such a statement.

In addition, despite Tyrone Hospital's disclosures indicating that Thiry will testify regarding the industry standards related to hospital revenue cycles, collections, accounts receivable, and financial health, Thiry's Report does not disclose or identify any industry standards related to hospital revenue cycles, collections, accounts receivable, and financial health. On this topic, Thiry testified that he would not offer any opinions about key performance indicators because they were not discussed in his Report. (Doc. 129-1, PageID.2090-2091).

For these reasons, Thiry's Report fails to satisfy the requirements of Rule 26(a)(2)(B)(i) because it does not contain a complete statement of all opinions the witness will express and the basis and reasons for them.

Thiry's Report also fails to satisfy the requirements of Rule 26(a)(2)(B)(ii) as it does not specify the specific data and information Thiry considered in reaching his conclusions, which Thiry concedes. (Doc. 129-1, PageID.2011-2013). Not only is this information not included in the

Preliminary Report, Thiry testified that he could not recall the information and documents he reviewed in preparing the Preliminary Report and reaching his conclusions. (Doc. 129-1, PageID.2016-2017). Similarly, the Supplemental Report does not specify the data and information used to form Thiry's conclusions. (*See* Doc. 129-1, PageID.2027-2030; Doc.129-3, PageID.2104). Accordingly, Thiry's Report is also deficient under Rule 26(a)(2)(B)(ii).

### B.    Thiry should be excluded from serving as an expert witness under Rule 37(c)(1).

Rule 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).  The advisory committee notes to Rule 26(a)(2) explain that "Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed." The burden is on the non-disclosing party to demonstrate either that its failure to disclose was substantially justified or that the failure is harmless, and this determination is left to the broad discretion of the lower court.  *Harrison Bros. Dry Dock & Repair Yard*, 2009 WL 3273926, at \*3.

There is no justification for Thiry's failure to provide an adequate expert report, and the failure to provide a report satisfying the requirements of Rule 26(a)(2) is harmful to the non-disclosing party who cannot adequately prepare for the expert's deposition. *Walter Int'l Prods., Inc. v. Salinas*, 650 F.3d 1402, 1413 (11th Cir. 2011). In *Walter Int'l Products*, the Eleventh Circuit Court of Appeals affirmed a trial court's exclusion of an expert where the expert's report was so deficient that opposing party had to depose the expert "without the benefit of a report containing his opinions or records supporting his testimony."  Additionally, the court noted in affirming the exclusion:

> The reason for requiring that an expert report be provided before a deposition is taken is so the opposing party can use the report to examine the expert at the deposition. As the district court pointed out, it is harmful to deprive opposing counsel of the expert's report before his deposition.

*Id.* TruBridge was harmed by Thiry's failure to provide an adequate expert report because (a) TruBridge was unable to review and analyze the underlying information Thiry relied upon in reaching his conclusions in the Preliminary Report and Supplemental Report in advance of Thiry's deposition; (b) TruBridge still does not know what documents and information Thiry relied on in reaching his conclusions in the Preliminary Report; (c) TruBridge was unable to adequately prepare for Thiry's deposition or examine him concerning his opinion on TruBridge's purported breach of the Amended Agreement; industry standards related to hospital revenue cycles, collections, accounts receivable, and financial health; or Tyrone's purported damages resulting from TruBridge's breach of the Amended Agreement; and (d) TruBridge still does not know what industry standards or key performance indicators Thiry may seek to discuss at trial. As a result, exclusion of Thiry's Report and testimony is the necessary remedy under Rule 37(c)(1).

## II.    Thiry should be excluded from giving expert testimony on TruBridge's performance under the Amended Agreement and any purported damages stemming therefrom because his proposed testimony does not satisfy the requirements of Rule 702.

The admission of expert testimony is governed by Rule 702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

In the Eleventh Circuit, courts "engage in a rigorous three-part inquiry" to determine the admissibility of expert testimony. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Courts consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* at 1260 (quoting *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion. *Id.* Each prong is a separate inquiry, so courts "must take care not to conflate" the three concepts. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

Regarding the second consideration – reliable methodology – although there is not a "definitive checklist or test" to determine whether an expert's method is sufficiently reliable, courts consider "(i) whether the theory or technique 'can be (and has been) tested,' (ii) whether it 'has been subjected to peer review and publication,' (iii) whether it has a 'known or potential rate of error,' and (iv) whether the theory or technique enjoys general acceptance in the relevant scientific community." *Deere & Co. v. FIMCO, Inc.*, 239 F. Supp. 3d 964, 982 (W.D. Ky. March 8, 2017) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594 (1993)). "[S]ubjective beliefs or unsupported speculation" are not reliable methods for reaching a conclusion. *Chapman v. Proctor & Gamble Distrib., L.L.C.,* 766 F.3d 1296, 1310 (11th Cir. 2014); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir. 2010) ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles."). An expert should not be allowed to testify about "scientifically unsupported 'leaps of faith.'" *Rider v.*

*Sandox Pharms. Corp.,* 295 F.3d 1194, 1202 (11th Cir. 2002) (affirming the district court's exclusion of the testimony of plaintiffs' expert because it was not based on "reliable evidence").

As for the final consideration – whether the testimony assists the trier of fact – expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004). *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir.1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments. *See* 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.03[2][a].

As the proponent of Thiry's testimony, Tyrone Hospital bears the burden of establishing the admissibility of his testimony. *Frazier*, 587 F.3d at 1260. Tyrone Hospital has not met its burden here.  Specifically, any testimony from Thiry concerning TruBridge's performance under the Amended Agreement or any damages purportedly resulting therefrom does not satisfy the requirements of Rule 702 and should be excluded.

A.     **Thiry's testimony concerning TruBridge's performance under the Amended Agreement should be excluded because it is unreliable and will not assist the trier of fact.**

Nowhere in Thiry's Report does Thiry explain how TruBridge breached the Amended Agreement. As previously explained, **Thiry testified that he cannot state what TruBridge did or did not do to breach the Amended Agreement**. (Doc. 129-1, PageID.2039-2040, 2056-2059).[4] Instead, Thiry explained in his deposition that his opinion is simply that TruBridge

_____

[4] As previously stated, this is presumably why Thiry, when asked whether he would testify during his deposition or at trial that TruBridge breached the Amended Agreement, answered, "I don't think so." (Doc. 129-1, PageID.2086).

somehow was in breach of the Amended Agreement because TruBridge was responsible for managing Tyrone Hospital's billing and collection processes and the amount of Tyrone Hospital's unbilled and aged A/R was in excess of industry norms at the time RCS prepared the Revenue Cycle Assessment. (Doc. 129-1, PageID.2033-2047). This opinion is nothing but speculation and cannot be supported by sound scientific principles. *See Chapman,* 766 F.3d at 1310 (holding that "subjective beliefs or unsupported speculation" are not reliable methods for reaching a conclusion); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d at 1194 ("Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles."). Thiry takes issue with the amount of Tyrone Hospital's unbilled and aged A/R, but he admits that (a) he did not analyze why the amount of Tyrone Hospital's unbilled and aged A/R existed and (b) TruBridge and Tyrone both contributed to the amount of the hospital's A/R. (Doc. 129-1, PageID.2046-2049, 2056-2057, 2060, 2084-2085). Moreover, Thiry's Report does not explain what industry norms exist for the amount of a hospital's unbilled and aged A/R or how Tyrone Hospital's A/R figures equated a breach of the Amended Agreement. In fact, he concedes that the Amended Agreement included no performance metrics tied to the amount of Tyrone Hospital's unbilled and aged A/R and that Tyrone Hospital agreed to not include such metrics in the Amended Agreement. (Doc. 129-1, PageID.2050-2052).[5]   Nevertheless, Thiry somehow reaches the conclusion that the amounts of Tyrone Hospital's unbilled and aged A/R constitutes a breach of the Amended Agreement by TruBridge.

This is exactly the type of "scientifically unsupported leap of faith" that Rule 702 is designed to preclude. *See Rider v. Sandox Pharms. Corp.,* 295 F.3d 1194, 1202 (11th Cir. 2002).

---

[5] Further, as previously noted, Thiry also testified that he would not offer any opinions about key performance indicators because there were not discussed in his Report. (Doc. 129-1, PageID.2090-2091).

Consequently, any testimony from Thiry stating that TruBridge breached the Amended Agreement is unreliable and should be excluded.

In addition, such a conclusory opinion is no more than what Tyrone Hospital's counsel would be able to offer in their closing arguments at trial, and, as a result, it must be excluded because the testimony will not assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue at trial. *See* 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.03[2][a].

**B.   Thiry's testimony concerning Tyrone Hospital's damages resulting from TruBridge's purported breach of the Amended Agreement should be excluded because it is unreliable and will not assist the trier of fact.**

In the Supplemental Report, Thiry summarizes the amount of Tyrone Hospital's losses resulting from TruBridge's breach of the Amended Agreement. Specifically, the Supplemental Report provides the amount of A/R that Tyrone Hospital purportedly lost because of TruBridge's breach of the Amended Agreement. According to the Supplemental Report, that amount is $797,111.63. (Doc. 129-3, PageID.2104). According to Thiry, he calculated this amount by (a) using figures provided by Tyrone Hospital that purportedly show amounts TruBridge failed to collect through its billing and collection processes; (b) inserting the figures into a spreadsheet; (c) for each A/R account, calculating the "Account Loss Value," which represents the value of the account that was expected to be collected from a third-party payer or the patient; (d) calculating a certain percentage of the "Account Loss Value" of each A/R account based on Tyrone Hospital's historical rates of payment to determine estimated payments that would have been collected if TruBridge used appropriate collection efforts; and (e) totaling all of the resulting amounts.

First, the Supplemental Report and any testimony concerning damages are unreliable because Thiry cannot provide the formula or analysis used to calculate the "Account Loss Value"

associated with each A/R account. (Doc. 129-1, PageID.2081-2083). Thus, it is impossible to determine "(i) whether the theory or technique 'can be (and has been) tested,' (ii) whether it 'has been subjected to peer review and publication,' (iii) whether it has a 'known or potential rate of error,' and (iv) whether the theory or technique enjoys general acceptance in the relevant scientific community." *Deere & Co.*, 239 F. Supp. 3d at 982   (quoting *Daubert.*, 509 U.S. at 594). Exacerbating these concerns, Thiry testified that is uncommon to calculate "Account Loss Value," and he has never had a report similar to the Supplemental Report admitted into evidence as an expert witness. (Doc. 129-1, PageID.2087-2089). For this reason, the Supplement Report and associated testimony should be excluded.

Second, the Supplemental Report and any testimony concerning damages are unreliable and will not assist the trier of fact because Thiry never verified the figures used in the Supplemental Report by logging into Tyrone Hospital's electronic health record system or analyzing whether TruBridge was actually responsible for the uncollected amounts used in the report. (Doc. 129-1, PageID.2018-2026, 2065-2071, 2074-2080, 2084-2085). Specifically, Thiry testified that an uncollected amount of A/R could result from a number of factors, several of which would have been beyond TruBridge's control. (Doc. 129-1, PageID.2048-2049, 2074-2080, 2084-2085). He also testified that he believes Tyrone Hospital's actions or inactions contributed to the hospital's amount of uncollected A/R. (Doc. 129-1, PageID.2048-2049, 2074-2075). Thiry further concedes he did not conduct any analysis to determine whether any uncollected amounts were caused by TruBridge's actions or inaction. (Doc. 129-1, PageID.2018-2026, 2065-2068, 2074-2080, 2084-2085). Instead, all Thiry did was take the figures provided to him by Tyrone Hospital and insert them in a spreadsheet. (Doc. 129-1, PageID.2018-2026, 2065-2071, 2084-2085).

Accordingly, the Supplemental Report, which purports to quantify Tyrone Hospital's damages, does not provide any actual insight into who is responsible for the uncollected amounts included in the "damages" calculation. In addition to the fact that Thiry did not calculate or verify the figures used in the Supplemental Report, Thiry also concedes that these figures are not an accurate reflection of Tyrone Hospital's purported losses because (a) the amounts do not take into consideration the costs of goods and services sold and (b) any self-pay amounts owed to Tyrone Hospital by patients may still be collected by the hospital. (Doc. 129-1, PageID.2072-2073, 2080). As a result, Thiry's opinions concerning Tyrone Hospital's purported damages resulting from TruBridge's breach of the Amended Agreement are unreliable speculation.

Furthermore, Thiry's insertion of figures into a spreadsheet and calculation of a percentage of those figures is not an application of scientific, technical, or specialized expertise that would assist the trier of fact. Assuming Tyrone Hospital could establish at trial that certain A/R accounts were not collected because of TruBridge's breach of the Amended Agreement and the amount of Tyrone Hospital's historical rates of payment, a layperson juror would be capable of calculating the percentage of the uncollected amounts in this case.

## CONCLUSION

For the foregoing reasons, TruBridge respectfully requests that the Court exclude Thiry's Report and testimony in its entirety.

DATED this 30th day of March, 2020.

Respectfully submitted,

*/s/ J. Walton Jackson*
J. Walton Jackson      (JACKJ1045)
*wjackson@maynardcooper.com*
Evan N. Parrott      (ASB-1950O65A)
*eparrott@maynardcooper.com*

Attorneys for Plaintiff/Counter-Defendant
    TruBridge, LLC

**OF COUNSEL:**
**MAYNARD, COOPER & GALE, P.C.**
RSA Battle House Tower
11 North Water Street, Suite 24290
Mobile, Alabama  36602
(t) 251.432.0001
(f) 251.432.0007

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 30th day of March, 2020, electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will forward a copy thereof to all attorneys of record.

*/s/ J. Walton Jackson*
OF COUNSEL